# Presidential Authority To Use Funds From the United States Emergency Refugee and Migration Assistance Fund

The United States Emergency Refugee and Migration Assistance Fund, established by § 2(c) of the Migration and Refugee Assistance Act of 1962, is available to cover the administrative costs of processing a recent influx of Cuban migrants to the United States, even though they have not been classified as refugees and are thus ineligible for assistance under other programs authorized by the Act.

Congress intended the President to have discretion to use the Fund for any emergency situation involving unexpected refugee and migration needs, whenever and wherever it occurs.

June 5, 1980

## MEMORANDUM OPINION FOR THE DEPUTY GENERAL COUNSEL, OFFICE OF MANAGEMENT AND BUDGET

This responds to your inquiry asking whether the President is authorized to use money from the United States Emergency Refugee and Migration Assistance Fund ("the Fund"), 22 U.S.C. § 2601(c)(2), to cover the administrative costs of processing the recent influx of Cuban citizens. Presidential Determination No. 80-18, 45 Fed. Reg. 29,787 (1980). We believe that the Fund is available to meet the needs of these Cuban citizens and that the President properly exercised his authority in issuing Determination No. 80-18. The State Department has come to the same conclusion.

The Migration and Refugee Assistance Act of 1962 (the Act), 22 U.S.C. § 2601 *et seq.,* was passed while the wave of Hungarian refugees was still fresh and during one of the first waves of Cuban emigration. As originally enacted, § 2(c) of the Act, 22 U.S.C. § 2601(c) was intended to give the President authority to use up to $10 million from his foreign aid contingency fund to meet such unexpected problems:

> Section 2(c) of the bill would authorize the President to use not to exceed $10 million in any fiscal year in order to meet unexpected refugee and migration developments when the President determines such use to be important to the national interest. Experience since World War II teaches that international tensions and Communist efforts to increase such tensions will result in escapee and refugee

670

problems. These situations may arise suddenly and it is impossible to predict where trouble may come. The bill recognizes the necessity of being prepared for such eventualities by the inclusion of the emergency provision just referred to.

S. Rep. No. 989, 87th Cong., 1st Sess. 3 (1962). *See also* H.R. Rep. No. 1369, 87th Cong., 2d Sess. 48 (1962) (H.R. 10079) ("These problems arise suddenly and it is often impossible to predict where and when the problems may arise.") [1]; H.R. Rep. No. 1066, 87th Cong., 1st Sess. 27–28 (1961). The legislative history of the Act indicates that the Fund could be used inside or outside the United States:

> The President of the United States has the authority now under the contingency fund to earmark whatever moneys he thinks are necessary in emergency situations. [The influx of Cubans] is a difficult problem for us to deal with. The President has dealt with it on an emergency basis by making available for Dade County, Fla., sufficient funds to reimburse [the county]. All this bill does is to write the same provision in the law, spell it out, so that in the event it is necessary in our judgment to cope with this sort of problem, it can be dealt with openly and everybody knowing exactly what we are doing, pursuant to congressional authorization and appropriation of funds.

108 Cong. Rec. 3384 (1962) (remarks of Rep. Walker, floor manager). It is clear, therefore, that Congress foresaw that one of the immediate— and continued—uses of the Fund would be to aid individuals of uncertain status within the United States.

This analysis of the scope of § 2(c) is not affected by the fact that § 2(b) of the Act is limited to refugees. Sections 2(b) and 2(c) were designed to meet different needs. Section 2(b) consisted of the continuation of membership in various international refugee organizations, 22 U.S.C. § 2601(b)(1) (Supp. IV 1959–62), the continuation of a program for escapees from Communist countries, *id.* § 2601(2), and the regularizing of aid to refugees within the United States. *Id.* § 2601(b)(3)–(6). *See* H.R. Rep. No. 1066, *supra,* at 12–27. Section 2(b)(3)–(6)'s aid was limited to those who met its definition of refugee, 22 U.S.C. § 2601(b)(3) (Supp. IV 1959–62), one almost identical to that of the Refugee Act of 1980. Section 2(c) permitted the President to provide "economic assistance" of up to $10 million from the contingency fund of the Act for International Development of 1961 for "unexpected refugee *and migration* developments . . . ." H.R. Rep. No. 1066, *supra,* at 27, 28 [emphasis added]. This contingency fund, in turn, was meant

---

[1] The Act and H.R. 10079 did not differ from each other except for one provision which is not relevant here. H.R. Rep. No. 1923, 87th Cong., 2d Sess. 4 (1962).

to be used "with broad discretion" by the President "to meet require-
ments which are either completely unforeseen or which are identified
but without enough precision to warrant inclusion in one of the other
categories." *Id.* at 27, quoting from H.R. Rep. No. 851, 87th Cong., 1st
Sess. 48 (1961) (contingency fund authorization). Migration is not de-
fined in 22 U.S.C. § 2601.[2] We have found no evidence that Congress
intended to limit the President's ability to aid migrants on an emer-
gency basis, although aid to them individually was not covered in § 2(a)
or (b). We do not believe, therefore, that the use of the emergency fund
in § 2(c) is tied to the express provisions of § 2(a) or (b). The Fund is
discretionary—for any emergency situation involving "unexpected
urgent refugee and migration needs" whenever and wherever they
occur. 22 U.S.C. § 2601(c) (Supp. IV 1959–62). *See also* H.R. Rep. No.
1369, *supra,* at 48.

The 1975 amendments, which created a standing fund in place of the
transfer authority described above, did nothing to change this analysis.
The President's discretion was reaffirmed. Assistance was to be "on
such terms and conditions as he may determine. . . ." 22 U.S.C.
§ 2601(c)(1) (1976). Expenditures would not need prior statutory
approval:

> Once created through this authorization and the neces-
> sary appropriation, the Fund would be available to meet
> emergency needs as determined by the President. For
> specific uses of the Fund, Congressional oversight would
> be retrospective, with justification being sent to the for-
> eign affairs and appropriations committees after the event.
> Over the longer run, however, the need for appropria-
> tions to replenish the Fund should enable Congress to
> maintain control and effective oversight.

S. Rep. No. 337, 94th Cong., 1st Sess. 23–24 (1975).

The Refugee Act of 1980 did not change this framework. It did
remove the care of refugees in the United States from § 2(b). Refugee
Act of 1980, § 312(b)(1). It did not, however, make any change in the
President's use of the § 2(c) Fund except to raise the amount of money
available. *Id.,* § 312(b)(2). A provision in H.R. 2816, which would have
limited use of the Fund to those within the United States, was deleted
from the final bill without explanation. The House did recognize that
emergency funds from § 2(c) have been used within the United States

---

[2] The Intergovernmental Committee for European Migration, 6 U.S.T. 603, 207 U.N.T.S. 189,
referred to in 22 U.S.C. § 2601(b)(1), does not define the term. It does, however, make clear that
refugees are only one kind of migrant. Annex, ¶ 4, 6 U.S.T. at 615, 207 U.N.T.S. at 210. Migrate is
defined in Webster's New International Dictionary (2d ed. 1957) as: "To go from one place to another;
esp., to move from one country, region, or place of abode or sojourn to another, with a view to
residence; to move; as, the Moors who *migrated* from Africa into Spain."

for individuals of uncertain status. H. Rep. No. 608, 96th Cong., 1st Sess. 4 (1979).

We believe that the legislative history of 22 U.S.C. § 2601(c) indicates a longstanding congressional intent to permit the President to use the Fund for purposes other than those specifically listed in 22 U.S.C. § 2601(a) and (b). Since the Refugee Act of 1980 did not amend the language of 22 U.S.C. § 2601(c)(1), money in the Fund may continue to be used within the United States to aid Cubans who have not yet been classified as refugees.

LARRY L. SIMMS
*Deputy Assistant Attorney General*
*Office of Legal Counsel*